Filed 11/6/14  P. v. Louie CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANNY LOUIE,<br><br>    Defendant and Appellant. | D065964<br><br><br><br>(Super. Ct. No. FSB1201283) |

APPEAL from a judgment of the Superior Court of San Bernardino County,

R. Glenn Yabuno, Judge.  Affirmed in part; reversed in part with directions.

Law Office of Allison H. Ting and Allison H. Ting, under appointment by the

Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E.

Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Danny Louie appeals from a judgment convicting him of witness intimidation, kidnapping during carjacking, and other offenses, with gang enhancements. Challenging the gang enhancements, he asserts there was instructional error and/or insufficient evidence for two of the elements required for the enhancement (the primary activity element and the gang benefit element). He also raises several challenges to his kidnapping during carjacking conviction, including the court (1) erred in denying his request for an instruction on the lesser offense of simple kidnapping; (2) did not instruct the jury that the burden of proof for the defense of mistaken belief in consent was on the prosecution, not the defense; and (3) erred in failing to instruct the jury that it should view his admissions with caution. We reject these contentions of reversible error.

The Attorney General acknowledges that two of defendant's convictions must be reversed: (1) a gang participation count because defendant did not engage in the criminal conduct with other gang members, and (2) a carjacking count because it is a lesser included offense of kidnapping during carjacking. We agree, and accordingly reverse and dismiss the gang participation and carjacking convictions. In all other respects, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

The charged offenses arose from incidents that occurred on March 24 and 25, 2012. In the first incident, defendant threatened Erma Hollins that she would be killed if she told police that her car had been stolen a few hours earlier. In the second incident the following day, defendant, while fleeing from the police, committed a kidnapping and carjacking against a second victim (identified at trial as John Doe). Defendant is a

2

member of the Five Times Hometown Crip Gang ("Five Times"), and he has several gang-related tattoos, including a tattoo of a five-point star on his cheek. His offenses were committed in a neighborhood claimed by this gang.

*Witness Intimidation of Hollins*

The March 24 witness intimidation occurred after a man (apparently defendant's cousin) approached Hollins outside a liquor store and asked her for a ride to a location about two blocks away. Hollins did not know the man, but she had seen him in the area before. Although she felt a little nervous, she agreed to provide the ride because the distance was not very far. When Hollins drove into an alley, the man told her to get out of her car. Hollins complied because she was afraid, and the man drove away in her car.

Hollins walked back to the liquor store; unsuccessfully tried to get someone to call the police for her; waited a couple of hours hoping her car would be returned; and eventually flagged down a police car. When defendant (who was getting into the passenger seat of a van) saw the police car approaching, he told Hollins "if you tell the police about my cousin stealing your car we're going to kill you." Defendant and the driver of the van then left the area. Because of defendant's threat, Hollins was afraid to report the crime, but she did so. Sometime later, the police found her car.

A police officer who spoke with Hollins at the scene testified that she appeared "pretty scared"; she was crying "off and on"; and she told the police she was "scared to death." When contacted by the police, Hollins identified defendant as the person who threatened her, but at trial she recanted this identification. Police witnesses testified that when she was interviewed at the scene and when a detective interviewed her the next day,

3

she stated the man who made the threat about killing her had a star tattooed on his face. When the detective showed her a photo lineup of six men with star tattoos on their faces, she identified defendant as the man who had threatened her.[1]  At trial, Hollins stated defendant had a star tattoo on his face, and she had seen him at the liquor store on previous occasions although she did not personally know him.  However, she testified defendant was not the man who threatened her and she merely told the police he was at the liquor store and he might be able to help identify the person who took her car.

To support that Hollins was afraid to identify the perpetrator of the threat, the detective testified that at Hollins's request he interviewed her at a friend's apartment; she told him she was staying with a friend because she feared the people involved in the case would find her and harm or threaten her; and when she looked at the photo lineup she appeared "very scared" and said "he's in there" but she was "afraid to get anybody in trouble."  An investigator for the district attorney's office testified Hollins told him she was afraid to come to court; she knew defendant and did not want to get him in trouble; and she wanted to give him a second chance.  Although Hollins claimed at trial that she did not know about a gang called Five Times, she acknowledged she told the police she did not want the case prosecuted because she was afraid of gang retaliation.[2]

---

[1]    The detective also showed Hollins a photo lineup of possible suspects for the taking of her car, but she was unable to make an identification.

[2]    Hollins also acknowledged that she had been approached by defendant's mother and his girlfriend about defendant's case, and at the mother's request Hollins signed a notarized statement stating defendant was not the person who took her car or who threatened her.

*Kidnapping and Carjacking Against Doe*

The March 25 kidnapping/carjacking occurred while Doe, accompanied by his nephew (David), was driving out of an apartment complex located near the liquor store where Hollins was threatened. Police witnesses testified they were at the apartment complex looking for defendant because he had been identified by Hollins as a suspect in the incident the previous day. The police spotted defendant standing under a carport, along with several other males including another member of the Five Times gang. As a marked police vehicle approached the group of males, defendant and the other gang member took off running. During an ensuing police pursuit, officers saw Doe's vehicle speeding away from the area.

Doe testified that as he was leaving the complex, defendant was running across the parking lot and Doe slammed on the brakes to avoid hitting defendant. When defendant noticed David sitting in the passenger seat of the car, defendant ran up to the passenger door, spoke to David, and entered the car. Doe testified the radio was playing in the car and he did not hear what defendant said when he spoke to David. According to a police officer who interviewed Doe after the incident, Doe reported that defendant "jumped" into the car and said "get the fuck out of here or I will fuck you up," and when Doe refused to drive defendant said "just drive, motherfucker, get out of here."

Doe testified he had never seen defendant before; he did not give defendant permission to enter the car; and he "[a]t first was kind of puzzled" and did not "know really what was going on." Because it appeared David knew defendant, Doe took his foot off the brake and, without pressing the gas pedal, allowed the car to roll slowly through

5

the parking lot as he tried to figure out what to do. When Doe saw police cars pass by, he assumed defendant was running from the police and he repeatedly stopped the car and told defendant to get out of the car. Defendant, who was lying down in the back seat in an attempt to hide, did not comply.

Defendant ordered Doe to drive "Motherfucker," and defendant and David were repeatedly yelling at Doe to "go, go, go." Doe did not want to be involved with someone who was running from the police and did not want to continue driving, but he felt he was being forced to do so. He was afraid because defendant was "frantic, a little excited, sweating and covered in tattoos"; he thought defendant was a gang member who was being chased by the police; he did not know defendant and did not know what defendant would do; and he was worried defendant might have a weapon.

After driving for about one and one-half miles, Doe decided to try to escape from defendant by going to a gas station because it was a public place with cameras. Doe parked the car at the gas station, got out of the vehicle with the car keys, and walked away towards a nearby market.[3] Meanwhile (unbeknownst to Doe), the police had been pursuing Doe's vehicle in an undercover vehicle. When the unmarked police vehicle arrived at the gas station, the officers saw David and defendant leave the car and enter the gas station store, while Doe walked away in another direction. The officers detained the three males. When interviewed at the scene, Doe was "tearing up," "very emotional," and "very upset," and he told the police he did not stop driving because he was afraid for his

_____

[3]     Doe testified that at the time of the incident he was on summary probation and he did not have a driver's license, but what concerned him was getting away from defendant.

6

life. Doe testified he knew about the Five Times gang, and he was afraid to testify because he did not want anything to happen to his friends or family.

*Gang Expert's Testimony*

The prosecution's gang expert (Detective Nelson Carrington) testified that the Five Times gang started in the 1980's (originally under a different name), and in March 2012 the gang had over 80 members. Five Times gang members used several special tattoos, including a five-point star. By the late 1990's and early 2000's, the gang had become "so violent" that the city imposed a gang injunction on it. The injunction, which can restrict even "loitering in the neighborhood with another gang member," is placed only on gangs that "are considered the worst." Defendant is one of the gang members listed on the gang injunction.

Detective Carrington testified he has investigated crimes committed by Five Times gang members, including narcotics sales, robberies, firearm possession, and shootings, and these crimes are the gang's primary activities. He has also investigated the crimes of intimidation, threats, and vehicle theft committed by the gang's members. Detective Carrington described several specific convictions incurred by Five Times gang members, including convictions in May 2008 for carrying a concealed firearm; in October 2010 for possession for sale of a controlled substance (methamphetamine); in August 2011 for criminal threats; and in December 2011 for murder with personal discharge of a firearm.

The carrying of a concealed firearm conviction involved a May 2008 incident in which the police saw the gang member loitering with other persons in violation of the Five Times gang injunction, and while fleeing from the police the gang member dropped

7

a firearm which discharged when it hit the ground. The gang member was charged with carrying a concealed firearm and resisting arrest, and he pled guilty to the concealed firearm charge. The possession for sale conviction involved a July 2010 traffic stop incident in which a gang member was found in possession of several individually pieced packages of a controlled substance. The gang member was charged with possession for sale of cocaine base and methamphetamine with gang benefit enhancements, and he pled guilty to possession of methamphetamine for sale. The criminal threats conviction involved an August 2011 domestic dispute during which the gang member threatened to kill his ex-girlfriend's boyfriend, and when the police arrived the gang member yelled, "fuck you, police, I'm Fifth Street Crip." The gang member was charged with making criminal threats and resisting an officer with gang benefit enhancements, and he pled guilty to the criminal threats charge. The murder conviction arose from a November 2010 incident in which a gang member shot a rival gang member in the back of the head after a gang-related verbal confrontation at a party. After a jury trial, the gang member was convicted of first degree murder with enhancements for personal discharge of a gun and intent to benefit a gang, and the offense of gang participation.

The gang expert testified that gang members want to instill fear in people to gain respect, and they want their gang to have a reputation as being "the toughest of the tough." They engage in conduct to frighten people who live in the area that they want to claim for their gang, so that they can brazenly commit crimes in this neighborhood without the people calling the police. Gang members can achieve this respect and fear by marking their territory with gang graffiti, committing crimes openly in public, and

8

threatening witnesses with physical harm or death if they contact the police. They also instill fear by displaying their gang tattoos in a "blatant and public" manner, including on their head or face, because "[m]ost people are afraid of a person they suspect to be a gang member."

The expert opined that when a gang member displaying gang tattoos commits a crime by himself, this can benefit the entire gang because the people in the community know the crime was committed by a gang member and they fear the entire gang and are afraid to tell the police. The expert stated that defendant's gang tattoo on his face showed how proud and bold he was about being a member of his gang and the tattoo would intimidate people. The expert opined that intimidation benefiting a gang would occur if a gang member with "tattoos blazing on the face" approached a carjacking victim in territory claimed by the gang and threatened the person with injury if she reported the crime. The expert explained the victim will know the person threatening to kill her is a gang member because of the five-point star tattoo, and this "will intimidate almost anybody."

*Defense and Rebuttal*

Relevant to the carjacking/kidnapping allegations involving Doe, David testified on behalf of the defense that when he saw defendant running at the apartment complex, it appeared defendant was "fearing for his life." David rolled down the car window, yelled out to defendant "what's going on," and defendant "told [David] can I get out of the apartments." David unlocked the back door so defendant could get in the car. Doe asked "what's going on? What is he doing? Like, where we going to go[?]" Without making

9

any threats, defendant told Doe that he should "[j]ust drive him. Get him out of the apartments." Doe continued driving, and as they were leaving the complex a police car "zoomed" past them at a fast speed. Doe appeared to be shocked by the way the police car sped by, but he continued driving out of the complex. When Doe noticed an officer standing on a street corner, Doe said he was on probation and could not be "caught up in anything," and he started speeding down the street.

In rebuttal, an officer who interviewed David about the incident testified that David told him that defendant said "drive motherfucker, get the fuck out of here" when he got in the car. David told the officer that he feared for his life because this was defendant's "hood" and "he had to live there," which the officer understood to mean that David "went along with what . . . defendant . . . was telling him because he feared later retaliation" given that they were in Five Times turf.

*Jury Verdict and Sentence*

For the incident involving Hollins, defendant was convicted of witness intimidation by force or threat (count 1, Pen. Code,[4] § 136.1, subd. (c)(1)).[5] For the incident involving Doe, defendant was convicted of carjacking (count 3, § 215, subd. (a)) and kidnapping during a carjacking (count 4, § 209.5, subd. (a)). The jury found a gang enhancement to be true for each of these counts. (§ 186.22, subd. (b)(1)(C).) Defendant

---

[4] Subsequent unspecified statutory references are to the Penal Code.

[5] Defendant was also charged with carjacking against Hollins (count 2), but the court dismissed this count before the case was submitted to the jury.

was also convicted of participating in a gang based on his conduct against Doe (count 5, § 186.22, subd. (a)).

The court sentenced defendant to prison for a 13-year determinate term, plus an indeterminate term of 15 years to life. The sentence consisted of three years for count 1 witness intimidation; 10 years for the gang enhancement on count 1; and 15 years to life for count 4 kidnapping during a carjacking. Sentences for the remaining charges were stayed.

## DISCUSSION

### I. *Reversal of Gang Participation Offense*

The Attorney General concedes that the count 5 gang participation conviction (§ 186.22, subd. (a)), which was based on the incident involving Doe, must be reversed because there is no evidence defendant committed the offenses against Doe with another gang member. (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1128, 1132.) We agree and reverse the gang participation conviction.

### II. *Challenges to Gang Enhancement Findings*

The gang enhancement statute provides for increased punishment when the defendant committed a crime to benefit a criminal street gang. (§ 186.22, subd. (b).) Defendant raises sufficiency of the evidence and/or instructional challenges related to two of the elements required for the gang enhancement: (1) the primary activity element, and (2) the gang benefit (or gang-related) element.

A. *Legal Principles*

The primary activity element concerns the threshold requirement that the gang meet the statutory definition of a criminal street gang. To establish a group as a criminal street gang, the prosecution must show the group has "as one of its primary activities the commission of one or more" statutorily specified crimes. (§ 186.22, subd. (f).) The commission of the statutorily enumerated crimes must be one of the group's principal occupations; the occasional commission of the crimes by the group's members does not suffice. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.) This element may be established by evidence showing the group's members consistently and repeatedly have committed statutorily enumerated offenses, or by testimony from a gang expert stating the gang was primarily engaged in the commission of statutorily specified offenses. (*Id.* at pp. 1222-1223.) Charged offenses in the current case can be included in the offenses relied upon to establish the primary activity element. (*Id.* at p. 1225, fn. 10.)

The gang benefit element is derived from the statutory requirement that the charged crimes be "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) To establish this element, the prosecution must show that the crime was gang related. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) The gang-related requirement may be shown by evidence indicating the offense could benefit the gang by enhancing the gang's reputation for violence and increasing the gang's stronghold on the neighborhood. (*Id.* at p. 63; see *People v. Gardeley* (1996) 14 Cal.4th 605, 619.) However, "[n]ot every crime committed

12

by gang members is related to a gang"; for example, an offense committed by gang members as part of " 'a frolic and detour unrelated to the gang' " is not gang related. (*Albillar, supra*, at pp. 60, 62.)  Further, a defendant's mere membership in the gang does not suffice to establish the gang enhancement.  (*Gardeley, supra*, at pp. 623-624.)  The gang enhancement statute may be applied when a gang member commits a crime with no showing that other gang members were involved; however, the record must show that the gang member's criminal conduct is connected to the activities of the gang.  (See *People v. Rodriguez, supra*, 55 Cal.4th at pp. 1138-1139 [enhancement may be applied to lone gang member who commits gang-related felony]; *People v. Rios* (2013) 222 Cal.App.4th 542, 562-563.)

When reviewing defendant's challenges to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence.  (*People v. Albillar, supra*, 51 Cal.4th at pp. 59-60.)  As to his claims of instructional error, we inquire whether there is a reasonable likelihood the jury applied the instructions in an erroneous manner.  (*People v. Butler* (2010) 187 Cal.App.4th 998, 1013.)  Generally, if the jury was erroneously instructed on the elements of the gang enhancement allegation, reversal is required unless the record shows the error was harmless beyond a reasonable doubt.  (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 320, 326-327.)

## B. *Challenges to the Primary Activity Element*

Offenses that qualify for the primary activity element include (among others) sale or possession for sale of controlled substances, unlawful homicide, assault with a deadly weapon or by means of force likely to produce great bodily injury, criminal threats and witness intimidation. (§ 186.22, subds. (e)(1), (3), (4), (8), (24), (f).) The jury here was instructed that the gang enhancement allegation required a showing that the group has as one of its primary activities the commission of "drug sales, murder, assault, criminal threats, [and] witness intimidation." The prosecution's gang expert testified the gang's primary activities included (among others) narcotic sales and shootings.

Challenging the sufficiency of the evidence for the primary activity element, defendant argues the record does not support that Five Times consistently and repeatedly (as opposed to occasionally) committed the statutorily delineated crimes that establish this element. The contention is unavailing. The jury was presented with evidence that the gang's primary activities included narcotic sales and shootings (i.e., assault with a deadly weapon), and that Five Times gang members had been convicted of first degree murder, criminal threats, and (based on the current case) witness intimidation. This evidence supports that the gang regularly commits the qualifying crimes of controlled substance sales, murder, assault with a deadly weapon, criminal threats and witness intimidation.

To support his claim that the group's commission of qualifying offenses is only sporadic and occasional, defendant points out that the evidence showed the commission of only one murder, one criminal threat, and one witness intimidation, and the gang

14

expert did not opine that these particular offenses were among the primary activities of the gang. These factors do not defeat the jury's finding on the primary activity element. First, the fact that the gang expert did not refer to these specific crimes as among the gang's primary activities did not preclude the jury from finding that the gang member's convictions of these offenses reflected the types of activities the gang was primarily involved in. Second, the jury was not required to find that the gang repeatedly engaged in *one particular* qualifying offense; rather, a finding that the gang consistently and repeatedly committed qualifying offenses could properly be based on the gang members' commission of three different statutorily specified offenses on three separate occasions, as well as the gang expert's opinion regarding the other qualifying offenses regularly committed by the gang. (See *People v. Sengpadychith, supra*, 26 Cal.4th at p. 324 [primary activity element can be shown by evidence of consistent and repeated commission of "criminal activity listed in the gang statute"].)

Defendant also raises claims of error because in some instances the offenses referred to in the prosecution's evidentiary presentation, the instructions, and the gang enhancement statute did not match with each other; i.e., the prosecution's evidence referred to narcotics sales, possession for sale of a controlled substance and shootings; the instructions referred to drug sales and assault; and the statute refers to controlled substance sales or possession for sale and assault with a deadly weapon. None of these factors create reversible error. Based on the commonly understood meaning of the words, we have no doubt the jury understood that narcotics sales, drug sales, and sale of controlled substances all refer to the same type of criminal conduct. If the jury

15

considered the possession-for-sale conviction to support the primary activity element, there was no error because this offense qualifies under the statute. Also, the jury could reasonably deduce that the shootings referred to by the expert meant assault with a deadly weapon given the evidence about the gang's history of violence and commission of a murder by shooting. Further, because the record contains no evidence that the gang committed simple assault rather than aggravated assault, there is no reasonable possibility the instructional reference to assault caused the jury to premise its finding on simple assault.

Defendant also challenges the foundational support for the gang expert's testimony regarding narcotics sales, asserting the expert merely stated he had investigated this crime but did not describe the results of his investigations. To the contrary, the expert (who was a member of the police department's gang unit and very familiar with the Five Times gang) testified he had investigated crimes *committed* by the gang, including narcotics sales, and he further opined that narcotics sales was one of the gang's primary activities. This testimony provided an adequate basis for the jury to conclude the gang regularly committed the offense of narcotic sales.

## C. *Challenge to the Gang Benefit Element*

With respect to the gang benefit element, defendant asserts the record does not support that the threat to Hollins and the kidnapping/carjacking of Doe were committed for the benefit of the gang.

16

Although there was no showing that defendant acted with another gang member when he committed the offenses, the record supports that his crimes were gang related. The jury could reasonably deduce from the evidence that Hollins and Doe recognized that defendant was a gang member; defendant's criminal conduct towards them caused them to fear for their lives because of their fear of his gang; and defendant was using the common gang modus operandi of instilling fear in the community and demanding noncooperation with the police. The evidence showed that defendant sported a very visible tattoo on his face that was associated with his gang, and he committed the crimes in an area claimed by his gang. Both Hollins and Doe specifically noticed defendant's tattoos: Hollins referred to his facial tattoo as the characteristic that allowed her to recognize him, and Doe referred to his tattoos as a source of his fear that caused him to continue driving. Drawing all inferences in favor of the jury's verdict, the record shows that defendant engaged in aggressive, threatening conduct towards Hollins and Doe: threatening Hollins that she would be killed if she reported the earlier carjacking to the police, and as he was running from the police threatening to "fuck" up Doe if he did not drive. Hollins acknowledged that she told the police that she did not want the case to be prosecuted because she was afraid of gang retaliation, and her fear was severe enough to cause her to be afraid to stay in her apartment. Doe told the police the area was defendant's "hood," and he testified he knew about the Five Times gang; he complied with defendant's order to keep driving because he thought defendant was a gang member and he was afraid; and he was afraid to testify because he was concerned about possible harm to his friends or family.

17

Considering all this evidence together, the jury could reasonably assess that the victims knew the area where defendant committed the crimes was claimed by his gang as its territory; the victims readily recognized him as a gang member by his facial tattoo; defendant committed the crimes in a fashion that conveyed to the victims that they had better obey him or they would suffer harm; and this criminal conduct was part and parcel of the gang's activities of intimidation designed to allow the gang to operate freely without police interference. The jury could also consider that the crimes involved specific demands that the victims stay away from or evade the police, which supported that defendant essentially communicated to the victims that given his status as a gang member he was entitled to thwart people's cooperation with the police.

We are not persuaded by defendant's suggestion that upholding the gang enhancement finding in his case in effect means anytime a gang member with a visible gang-related tattoo commits a crime in public in the gang's claimed territory, the crime can automatically be deemed a gang-related offense. To the contrary, a gang enhancement might not be supported if a gang member with a visible gang tattoo commits a crime without instilling fear in the community about the gang or using the crime to advance the gang's activities; for example, if the gang member steals an item for his own personal use without being observed by or communicating with the victim. We also reject defendant's contention that the gang-benefit element for the incident involving Doe cannot be sustained because the expert did not explicitly address this count when providing his opinion on gang-benefit conduct. The expert provided sufficient information to the jury about the types of fear-instilling activities engaged in by gang

18

members to support the jury's conclusion that defendant acted to benefit his gang during the offense against Doe.

The record supports that defendant's conduct of threatening Hollins and committing the kidnapping/carjacking against Doe was gang related so as to support the gang-benefit enhancement.[6]

III.  *Reversal of Count 3 (Carjacking) as Lesser Included Offense of Count 4*

*(Kidnapping During Carjacking)*

Defendant argues, and the Attorney General agrees, that he may not be convicted of both carjacking (count 3) and kidnapping during carjacking (count 4) because carjacking is a lesser included offense of kidnapping during carjacking.  We also agree.

A defendant may not receive multiple convictions for a single act or course of conduct based on lesser included offenses.  (*People v. Sanders* (2012) 55 Cal.4th 731, 736.)  An offense is a lesser included offense if the greater offense cannot be committed without also necessarily committing the lesser offense.  (*Id.* at p. 737.)  Kidnapping during carjacking is committed when the defendant commits a carjacking, and also commits a kidnapping to facilitate the carjacking.  (§ 209.5, subd. (a); *People v. Medina* (2007) 41 Cal.4th 685, 693.)  Because kidnapping during carjacking by definition cannot

---

6      In his appellate briefing, defendant focuses his arguments on the gang-related prong of the gang enhancement statute, and he does not elaborate on the specific intent prong.  (See *People v. Rios, supra*, 222 Cal.App.4th at p. 564.)  In any event, the evidence supporting that defendant's conduct was designed to benefit his gang by instilling fear in the community to allow gang activity to occur unimpeded by the police likewise supports an inference that he intended his conduct to further the criminal activities of gang members.

be committed without necessarily committing carjacking, carjacking is a lesser included offense of kidnapping during carjacking. (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 415.) Accordingly, the carjacking conviction must be dismissed. (*Ibid*.)

IV. *Challenges to Count 4 Kidnapping During Carjacking*

A. *Refusal To Instruct on Simple Kidnapping as Lesser Included Offense*

Defendant argues the court erred by declining his request that the jury be instructed on simple kidnapping as a lesser included offense of kidnapping during a carjacking.

As stated, kidnapping during carjacking is committed when a defendant engages in a kidnapping to facilitate a carjacking. (*People v. Medina, supra*, 41 Cal.4th at p. 693.) Accordingly, simple kidnapping is a lesser included offense of kidnapping during carjacking because kidnapping during carjacking cannot be committed without necessarily committing kidnapping. (See *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1368; *People v. Eid* (2010) 187 Cal.App.4th 859, 868.)[7]

A trial court is required to instruct on a lesser included offense when there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present. (*People v. Ortiz, supra*, 208 Cal.App.4th at p. 1367.) Substantial evidence in this context is evidence from which reasonable jurors could

---

[7]     The trial court refused to instruct on simple kidnapping based on its conclusion that simple kidnapping is not a lesser included offense of kidnapping during carjacking. The Attorney General does not argue in support of the court's conclusion on this point, but assumes arguendo that simple kidnapping is a lesser included offense of kidnapping during carjacking.

20

conclude that the lesser offense, but not the greater, was committed. (*People v. Medina, supra*, 41 Cal.4th at p. 700.) The rationale for requiring instruction on lesser included offenses is to avoid forcing the jury into an " 'unwarranted all-or-nothing choice' " which creates the risk the jury will convict on the charged offense even though one of the elements remains in doubt because " 'the defendant is plainly guilty of *some* offense . . . .' " (*People v. Hughes* (2002) 27 Cal.4th 287, 365.)

When evaluating whether a lesser included offense instruction should have been given, we construe the evidence in the manner most favorable to the defendant and apply an independent standard of review. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584-585; *People v. Ortiz, supra*, 208 Cal.App.4th at p. 1367.) There is no duty to instruct on a lesser included offense when the evidence, even construed most favorably to the defendant, is such that the defendant, if guilty at all, could only be guilty of the greater offense; that is, when the evidence that the offense was less than that charged is nonexistent or minimal and insubstantial. (*Ortiz, supra*, at p. 1367; *People v. Smith* (2013) 57 Cal.4th 232, 240; *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1410.)

On this record, there is no substantial evidence that, if defendant was guilty of kidnapping, he was guilty of the lesser offense of simple kidnapping rather than the greater offense of kidnapping during carjacking. Kidnapping is committed when the defendant uses force or fear to move the victim. (*People v. Ortiz, supra*, 208 Cal.App.4th at p. 1368; § 207, subd. (a); see *People v. Martinez* (1999) 20 Cal.4th 225, 237.) Kidnapping during a carjacking is committed when the defendant commits a carjacking (i.e., uses force or fear to take a vehicle from the victim); to facilitate the carjacking the

21

defendant commits a kidnapping; and the kidnapping involves movement of the victim beyond what is merely incidental to the carjacking, that is a substantial distance from the vicinity of the carjacking, and that increases the risk of harm to the victim above that present in the crime of carjacking. (§§ 215, 209.5; *People v. Medina, supra*, 41 Cal.4th at p. 693.) If the jury credited the evidence showing defendant *did not* use fear to make Doe drive, then defendant was guilty of neither kidnapping nor kidnapping during carjacking; thus, there was no need to instruct the jury on simple kidnapping based on the evidence that Doe drove the car voluntarily.

On the other hand, if the jury credited the evidence showing defendant *did* use fear to make Doe drive and concluded he committed a kidnapping, there was no reasonable evidentiary basis for the jury to find that he committed merely simple kidnapping rather than kidnapping during a carjacking. The evidence that defendant wanted to use the car to get away was undisputed, and there was no evidence that defendant had any reason to interact with Doe apart from making him drive the car. Further, it was undisputed that Doe drove the car about one and one-half miles away from the point where defendant first entered the vehicle, and under circumstances where defendant was fleeing from the police. These circumstances exposed Doe to a risk of injury while he continued driving, when he decided to park and get away from defendant, and when he was apprehended by the police. Assuming the jury found defendant committed a kidnapping, the evidence necessarily established all the elements of kidnapping during carjacking: defendant committed a kidnapping to effectuate a carjacking, and the movement of Doe's person was more than merely incidental to defendant's taking control of the vehicle, was a

22

substantial distance from the vicinity of the carjacking, and increased the risk of harm to Doe. Because the nature of the kidnapping necessarily satisfied the elements of kidnapping during carjacking, the court was not required to instruct on the lesser offense of simple kidnapping.

Defendant argues the jury could have found him guilty of simple kidnapping but not kidnapping during carjacking based on a finding that he merely wanted a ride away from the apartment complex (thus he used fear to commit the kidnapping of Doe's person for this purpose) but he had no intent to take Doe's car or exercise control over it (thus he did not commit the offense of carjacking). The contention is unavailing. A carjacking requires that the defendant intend to permanently *or temporarily* deprive the victim of possession of the vehicle. (§ 215, subd. (a); *People v. Medina, supra*, 41 Cal.4th at p. 693.) This taking of possession can occur when the defendant imposes his dominion or control over the car by ordering the victim to drive. (*People v. Duran* (2001) 88 Cal.App.4th 1371, 1377.) Defendant's intent to obtain a ride from Doe through the use of fear satisfied the intent-to-take element for carjacking because it showed he intended to temporarily deprive Doe of control over the vehicle. The fact that defendant may not have intended to keep the car in his possession or continue demanding a ride after he was transported away from the police does not relieve him of culpability for carjacking.

Alternatively, even assuming the court should have instructed on simple kidnapping, the error was harmless because there is no reasonable probability the jury would have found defendant guilty of simple kidnapping instead of kidnapping during carjacking. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1267 [reasonable probability

23

of different outcome standard generally applies to erroneous failure to instruct on lesser included offense].)  Given the compelling evidence that the kidnapping was designed to facilitate the carjacking and met the nonincidental/substantial distance/increased risk of harm elements of the kidnapping during carjacking offense, there is no reasonable likelihood the jury would have selected the lesser offense over the greater offense.  (See *id*. at pp. 1267-1268.)

The lack of prejudice is also buttressed by the fact that the trial court *did* instruct the jury on false imprisonment by violence or menace as a lesser included offense of kidnapping during carjacking, and the jury did not select this lesser offense.[8]  The jury's selection of the greater offense of kidnapping during carjacking rather than false imprisonment supports that even if it had been instructed on simple kidnapping it would have selected kidnapping during carjacking.

Defendant argues that we should apply the stricter harmless-beyond-a-reasonable doubt standard for federal constitutional error.  (See *People v. Prince, supra*, 40 Cal.4th at p. 1267 [recognizing there may be circumstances where failure to instruct on lesser included offenses creates federal constitutional error].)  Even under this standard, the record shows no reasonable possibility the jury might have selected the lesser offense of simple kidnapping rather than kidnapping during carjacking.

---

[8]     The jury was instructed that the lesser included offense of false imprisonment by violence or menace is committed when the defendant "confined or detained" the victim by violence or menace and made the victim "stay or go somewhere against" the victim's will.  (See CALCRIM No. 1240.)

B.  *Claim that Jury Was Not Instructed that the Prosecution, Not the Defense, Had the Burden of Proof for Defense of Mistaken Belief in Consent*

If a defendant has a mistaken belief in the victim's consent, he is not guilty of the offense of kidnapping during carjacking.  Defendant argues the trial court erred because it did not instruct the jury that the *prosecution* had the burden to prove the absence of this defense.  Although defendant recognizes the court instructed the jury on the belief-in-consent defense, he maintains the instruction was inadequate because instead of using the language concerning this defense that is contained in the standard instruction on kidnapping during carjacking (CALCRIM No. 1204), the court instructed the jury on the defense based on a mistake-of-fact instruction set forth in CALCRIM No. 3406.  Defendant views the latter instruction as placing the burden of proof for the defense on the *defendant* instead of on the prosecution.  We reject this claim because the instructions provided to the jury, including CALCRIM No. 3406, correctly informed the jury that it was the prosecution's burden to prove the absence of this defense.

Generally, for crimes that include an element that the victim did not consent, the defendant may raise a defense based on the defendant's reasonable belief that the victim consented.  (*People v. Mayberry* (1975) 15 Cal.3d 143, 153-155.)  A mistaken belief in consent is premised on mistake of fact, which is deemed to negate the basic requirement of wrongful intent that underlies criminal conduct.  (*Ibid.*)  The defendant need only raise a reasonable doubt whether he or she had a reasonable belief in consent, and the ultimate burden of persuasion remains on the prosecution to prove the nonexistence of this belief beyond a reasonable doubt.  (*Id.* at p. 157; *People v. Howard* (1996) 47 Cal.App.4th

25

1526, 1533; *People v. Eid, supra*, 187 Cal.App.4th at p. 878 [reasonable belief in consent is element of offense when there is evidence to support it]; see *People v. Williams* (1992) 4 Cal.4th 354, 361.) A trial court has a sua sponte duty to instruct the jury on the allocation and weight of the burden of proof. (*People v. Mower* (2002) 28 Cal.4th 457, 483.)

Here, the trial court gave the jury the standard instruction on kidnapping during carjacking (CALCRIM No. 1204), which included the requirement that the prosecution proves the victim "did not consent to the movement." CALCRIM No. 1204 also contains language setting forth the defense of belief in consent, and the bench note for the instruction states this language should be included when the defense is supported by the evidence. This portion of CALCRIM No. 1204 states: "The defendant is not guilty of kidnapping if [he] reasonably and actually believed that the other person consented to the movement. *The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement. If the People have not met this burden, you must find the defendant not guilty of this crime*." (CALCRIM No. 1204, italics added.) When instructing the jury with CALCRIM No. 1204, the trial court did not include this belief-in-consent language.

Instead, the court instructed on the belief-in-consent defense using language from CALCRIM No. 3406. The jury was told: "The defendant is not guilty of carjacking and kidnapping for carjacking if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as

26

he reasonably believed them to be, he did not commit carjacking. *If you find that the defendant believed that he had consent and if you find that belief was reasonable, he did not have the specific intent or mental state required for carjacking or kidnapping for carjacking.* [¶] *If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for carjacking and kidnapping, you must find him not guilty of those crimes*." (Italics added.)

Defendant argues the CALCRIM No. 3406 mistake-of-fact instruction provided to the jury was deficient because—unlike the omitted paragraph in CALCRIM No. 1204—the instruction failed to state that his lack of belief in the victim's consent was in effect an element of the offense that the prosecution had the burden to prove beyond a reasonable doubt. To review this claim, we inquire whether there is a reasonable likelihood the jury misunderstood the burden of proof on the belief-in-consent issue. (See *People v. Butler, supra*, 187 Cal.App.4th at p. 1013.) We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions. (*Ibid*.)

In the general instruction on burden of proof the jury was told: "[The] presumption [of innocence] requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." (See CALCRIM No. 220.) The CALCRIM No. 3406 mistake-of-fact instruction informed the jurors that they must find defendant *not guilty* if they had a *reasonable doubt* about whether defendant had a reasonable belief that the victim consented. Considering the general burden-of-proof instruction along

27

with the mistake-of-fact instruction, the jurors would have understood that the prosecution's duty to prove guilt beyond a reasonable doubt extended to the issue of defendant's belief in consent because *they were required to acquit him if they had a reasonable doubt as to whether he reasonably believed the victim voluntarily consented.* The clear import of the mistake-of-fact instruction was if the prosecution did not prove beyond a reasonable doubt that defendant did not have a reasonable belief in consent, he was entitled to a not guilty verdict.  (See, e.g., *People v. Fiu* (2005) 165 Cal.App.4th 360, 386 [prosecution's burden to disprove defense that aider and abettor withdrew is adequately conveyed by instruction stating "that if the jury has a reasonable doubt whether or not the defendant effectively withdrew, [it] should acquit"]; see also *People v. Smith* (2005) 135 Cal.App.4th 914, 929 [general burden of proof instruction combined with instruction on elements of defense were sufficient; court was not required to sua sponte reiterate burden of proof for each particular defense].)

To support his contention that the instructions were inadequate, defendant asserts the instructions told the jury about belief in consent *as a defense that he must prove*, rather than as a defense that the prosecution must disprove.  There is no reasonable likelihood the jury interpreted the mistake-of-fact instruction to mean defendant had the burden to prove the defense.  As set forth above, defendant need only raise a reasonable doubt to support the belief-in-consent defense, and once this showing is made, the prosecution has the burden to disprove defendant's belief in consent.  The mistake-of-fact instruction does *not* apprise the jury of these nuances of the law; i.e., it does not refer to the belief-in-consent issue as a defense, and it says nothing about the initial burden

28

placed on the defendant followed by the ultimate burden of proof on the prosecution. Rather, the instruction affirmatively states defendant is not guilty if he did not have the required mental state because of a mistaken belief in the victim's consent, and *a reasonable doubt on this issue requires a not guilty verdict*. The reference to the reasonable doubt standard is consistent with the prosecution's burden to disprove belief in consent beyond a reasonable doubt. Further, during closing argument the parties made no statements suggesting defendant had the burden to prove he believed the victim consented; rather, they merely presented their differing views on whether he had the intent to commit the crime based on his belief in the victim's consent.

To support his contention, defendant cites the language in the mistake-of-fact instruction stating "if you find" that defendant believed he had consent, and asserts this terminology could have misled the jury to think he had the burden to prove the defense. We are not persuaded. Given the explicit reference to the reasonable doubt standard, there is no reasonable likelihood the jury thought a higher showing was required to establish the defense.

Considering the instructions as a whole, there is no reasonable likelihood the jurors interpreted the instructions to mean defendant, rather than the prosecution, had the burden of proof for the defense of mistaken belief in consent. Defendant's claim of instructional error on this point is unavailing.

29

## C. *Failure To Instruct that Defendant's Admissions Should Be Viewed With Caution*

Defendant argues his kidnapping-during-carjacking conviction must be reversed because the court failed to instruct the jury to view his admissions with caution. (See CALCRIM No. 358.)[9] The Attorney General does not dispute the instruction should have been given, but asserts the error was harmless.

A trial court has a sua sponte duty to instruct the jury that it must view evidence of a defendant's oral admissions with caution. (*People v. Dickey* (2005) 35 Cal.4th 884, 905.) Because witnesses may inaccurately report a defendant's statements, the purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made. (*Ibid.*; *People v. Bemis* (1949) 33 Cal.2d 395, 399.) The failure to tell the jury to view the evidence of the defendant's admissions with caution does not require reversal unless the defendant shows it is reasonably probable the outcome would have been more favorable had the instruction been given. (*Dickey, supra*, at p. 905.) Other instructions, including thorough instructions on assessment of witness credibility, may adequately alert the jury to view the evidence of defendant's omissions with caution so as to make

---

9    CALCRIM No. 358 states: "You have heard evidence that the defendant made . . . oral or written statements . . . . You must decide whether the defendant made any . . . statements, in whole or in part. If you decide that the defendant made such . . . statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] *Consider with caution any statement made by . . . defendant tending to show his . . . guilt unless the statement was written or otherwise recorded.*" (Italics added; brackets and parentheses omitted.)

30

the instructional omission harmless. (See *People v. McKinnon* (2008) 43 Cal.4th 610, 680; *People v. Wilson* (2008) 43 Cal.4th 1, 19, 20.)

The evidence of defendant's admissions included the police officer's testimony that Doe reported that defendant told him to drive or he would "fuck you up" as he entered the car, and Doe's testimony and the officer's testimony that defendant ordered Doe to drive "motherfucker." This testimony was contradicted by David's testimony that defendant did not make any threats, and (arguably to some extent) by Doe's testimony that he did not hear what defendant said to David when he arrived at the car. The jury needed to make credibility determinations concerning the testimony and reports about defendant's statements, as well as the import of his statements considering all the circumstances. Although these matters required the jury to determine whether defendant's statements in the car were accurately reported, the jury was thoroughly instructed on how to assess credibility and the level of proof required to convict.

The instructions on witness credibility told the jurors that they alone must judge the believability of the witnesses, and set forth a lengthy, detailed list of the factors the jury should consider, including ability to perceive and remember, bias, consistency, prior statements, and reasonableness as compared to other evidence. (See CALCRIM Nos. 226, 318.) These instructions alerted the jury to critically evaluate the evidence provided by the witnesses, which would include the testimony and statements supporting that defendant threatened Doe. The jury also knew from the instructions that defendant was presumed innocent, the prosecution had to prove him guilty beyond a reasonable doubt (see CALCRIM No. 220) and that circumstantial evidence could not be relied upon to

31

conclude a fact has been proven unless the prosecution has proven each fact essential to the conclusion beyond a reasonable doubt (see CALCRIM No. 224). From these instructions on the burden of proof and circumstantial evidence, the jurors would have understood that they should not rely on the evidence of defendant's statements unless they were convinced the statements were firmly established by the evidence.

Given the detailed instructions telling the jury to consider numerous factors when making its credibility determinations and to acquit unless guilt was proven beyond a reasonable doubt, defendant has not shown it is reasonably probable the jury would have reached a different result had it been explicitly told to view his admissions with caution.[10]

---

[10] Defendant does not claim the cautionary instruction was required for his threatening statement to Hollins to support the witness intimidation count, based on case authority holding that the instruction is not required when "the defendant's words constitute the crime itself." (*People v. Zichko* (2004) 118 Cal.App.4th 1055, 1057, 1059-1060.) We note the California Supreme Court has granted review in a case in which the court disagreed with *Zichko*'s holding. (*People v. Diaz*, S205145, rev. granted Nov. 20, 2012.) In any event, we would find the omission of the cautionary instruction to be harmless with respect to defendant's statement to Hollins based on the credibility and burden of proof instructions provided to the jury, plus the fact that the main dispute concerning the witness intimidation count was not whether the statement was accurately reported, but whether defendant was the person who made the statement. (See *People v. Wilson, supra*, 43 Cal.4th at p. 20.)

## V. *Claim of Cumulative Error*

Defendant argues the cumulative effect of error requires reversal. Apart from the errors conceded by the Attorney General and which require reversal (i.e., the gang participation and carjacking convictions), any additional errors were not so egregious as to require reversal even viewed cumulatively. To the extent there were or may have been errors, on this record there is no reasonable possibility that the jury relied on improper matters for the primary activity element, that it would have selected simple kidnapping rather than kidnapping during carjacking, or that it did not understand it should critically evaluate the evidence of defendant's admissions.

## DISPOSITION

The convictions for count 3 carjacking (§ 215, subd. (a)) and count 5 gang participation (§ 186.22, subd. (a)) are dismissed. In all other respects, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment removing the count 3 and count 5 convictions, and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

HALLER, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.

33